IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

KEITH H. GRAFT,                          )
                                         )
        Plaintiff,                       )
                                         )
        vs.                              )    Civil Action No. 07-654
                                         )
MICHAEL J. ASTRUE,                       )
Commissioner of Social Security,         )
                                         )
        Defendant.                       )

## MEMORANDUM OPINION

### I.    INTRODUCTION

Pending before the Court are cross-motions for summary
judgment filed by Plaintiff Keith H. Graft and Defendant Michael J.
Astrue, Commissioner of Social Security. Plaintiff seeks review of
final decisions by the Commissioner denying his claims for
disability insurance benefits ("DIB") under Title II of the Social
Security Act, 42 U.S.C. §§ 401 *et seq.*, and supplemental security
income benefits ("SSI") under Title XVI of the Social Security Act,
42 U.S.C. §§ 1381 *et seq.* For the reasons discussed below,
Defendant's motion is denied and Plaintiff's motion is granted
insofar as he seeks remand for further consideration by the
Commissioner.

### II.   BACKGROUND

#### A.    Factual Background

Plaintiff Keith Graft was born on October 8, 1980. As

1

early as kindergarten, his teachers were concerned that he was not performing at grade level, had difficulty following directions, and rarely completed assignments. (Certified Copy of Transcript of Proceedings before the Social Security Administration, Docket No. 6, "Tr.," at 160-161.) A battery of standardized tests performed in May 1987 showed Plaintiff was in the borderline range of intelligence and that his reading, spelling, and arithmetic achievement levels were "significantly below grade level expectancies." He was placed in a special education class beginning in first grade and continued in a self-contained classroom with learning support through sixth grade. Notes from a later psychiatric evaluation indicate that according to his mother, Plaintiff had performed "fairly well" in that environment, but in the next two school years, he began to demonstrate "significant behavior problems." (Tr. 125.)

In April 1996, when Plaintiff was 15 years old, he was referred for a psychiatric evaluation after three violent outbursts at school during which he injured, threatened, and was physically and verbally abusive to other students and teachers. He was described as being unable to deal with criticism from any source or handle common social interactions, and he displayed unpredictable "severe temper outbursts when agitated or verbally challenged," behavior for which he showed no remorse. (Tr. 151-152.)

In July 1996, during an evaluation to determine continuing

2

eligibility for special education services, his instructor noted
that Mr. Graft could comprehend oral and written directions, work
independently, and stay on task, but did not ask for help when
needed, took a long time to complete tasks, had great difficulty in
unfamiliar social settings, and demonstrated a history of
aggressively acting out. His high school administrator (who had
been one of the three individuals whose injuries were mentioned in
the April 1996 report) stated that she had

> witnessed the transformation that occurred as a result of
> Keith's anger. I saw him change from passive to
> aggressive and display both violent speech and actions.
> Keith's aggressive behavior, its unpredictability and his
> demonstrated inability to control it should be emphasized
> in the development of an educational plan for him.

(Tr. 129.)

On the Wechsler Intelligence Scale for Children III, Mr.
Graft's verbal IQ was measured at 84 (low average), his performance
IQ at 78 (borderline) and his full scale IQ also at 78
(borderline); his overall performance ranked in the seventh
percentile, despite his cooperation and willingness to try during
the test.   Other tests revealed deficiencies in visual motor
integration, reading, spelling, and math reasoning. (Tr. 130-131.)
It was determined that Plaintiff continued "to be eligible and in
need of special education." (Tr. 132.)

As a follow-up to the evaluation by school administrators, Dr.
Fred R. Shultz completed a psychiatric evaluation on August 23,

1996.[1]  (Tr. 125-127.)  Dr. Schultz described Mr. Graft as a "slower learner with limited social skills. . .difficulty coping with unfamiliar social situations," and a limited peer group. He noted, "Although denied by Keith and his mother, it appears that Keith, at times, loses his temper at school when he is feeling frustrated and overwhelmed.  It appears that he may lash out physically on those occasions."  His diagnoses were dysthymic disorder, possible developmental reading and math disorders, low average/borderline intellectual functioning, intermittent abdominal pain, difficulties with peer relationships at school, and a Global Assessment of Functioning ("GAF") score[2] of 45 at the time of his evaluation and a high of 50 in the past year.  Dr. Schultz concluded Mr. Graft would benefit from continued mental health treatment and placement in a self-contained, supportive, highly-

---

[1]  Dr. Schultz referred to an earlier psychiatric evaluation he had performed on November 1, 1994, but this report does not appear in the record.  (Tr. 125.)

[2]  The GAF scale assesses how well an individual can function according to psychological, social, and occupational parameters, with the lowest scores assigned to individuals who are unable care for themselves.  Drejka v. Barnhart, CA No. 01-587, 2002 U.S. Dist. LEXIS 7802, *5, n.2 (D. Del. Apr. 18, 2002).  A GAF rating between 40 and 50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).  See the on-line version of the DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, Multiaxial Assessment, American Psychiatric Association (2002), at www.lexis.com., last visited April 17, 2008 ("Online DSM-IV.")  Neither Social Security regulations nor case law requires an ALJ to determine a claimant's disability based solely on a GAF score.  See Ramos v. Barnhart, CA No. 06-1457, 2007 U.S. Dist. LEXIS 23561, *33-*34 (E.D. Pa. Mar. 30, 2007), and cases cited therein.

structured educational setting including emotional support through a public school program, a "partial hospitalization program," or a day treatment program. He also recommended treatment with Zoloft, especially during the school year. (Tr. 127.)

There is no evidence Mr. Graft received any of the recommended treatments. In fact, his mother expressed a desire that Plaintiff be home-schooled half a day and attend vocational technical classes for the remainder of the day. Dr. Schultz was reluctant to adopt this program unless his participation in vo-tech was closely monitored due to the fact that "in the past, Keith has had difficulty functioning in settings. . .that required him to interact with a large number of other students." (Tr. 127.)

Plaintiff was home-schooled during the academic year 1996-1997 and made "adequate educational progress according to the parameters of his IEP [individualized educational program.]" (Tr. 172.) However, at the beginning of the next academic year, Mr. Graft's high school principal stated that Mr. Graft had withdrawn from school as of October 7, 1997;

[a]t the time of his withdrawal, he was being home schooled and considered to be in grade 11. His expected graduation date would have been June 1999. Keith has indicated to us that he will be obtaining his G.E.D. at a later date.

(Tr. 171.)

Thereafter, Mr. Graft worked briefly as a cleaner in a feed mill from September through October 1999 and as a laborer

5

refurbishing propane tanks from September through December 2000.

In June 2001, Plaintiff began working as a forklift operator and cardboard baler. (Tr. 82.) In April 2002, Mr. Graft was taken to the emergency room of Frick Hospital in Mt. Pleasant, Pennsylvania, complaining of bilateral anterior chest pain despite having no history of cardiac problems. A number of diagnostic tests were performed but his heart rate returned to normal and the pain subsided without further treatment. Emergency room personnel questioned whether marijuana Mr. Graft had smoked earlier that day might have been contaminated. (Tr. 214-215.)

On July 12, 2002, Mr. Graft's mother contacted his primary care physician, Dr. Mark S. Williams, reporting that the previous evening, Mr. Graft had experienced another episode of chest pain but she was unable to persuade him to go to the emergency room. (Tr. 233.) The person with whom Mrs. Graft spoke further noted, without explanation, that Plaintiff was "unable to come to the office." (Id.)

Three days later, Mr. Graft returned to the Frick Hospital emergency room, this time complaining of "fluttering" in his chest, palpitations, and difficulty breathing, but no fainting, chest pain, excessive perspiration, or lightheadedness. He was unable to identify any precipitating event for this attack. A chest x-ray and EKG were essentially normal and he was released without further treatment. The emergency room physician noted generalized anxiety

6

disorder among his diagnoses. (Tr. 207-208.)

Mr. Graft stopped working as of August 16, 2002. (Tr. 82.) He continued to experience chest pains, shortness of breath, and lightheadedness sufficiently severe to be seen at the hospital emergency room on two more occasions in October 2002. Objective medical tests were unable to find any physical origin of his symptoms. (Tr. 199-200; 191-192.) In a disability report dated October 15, 2004, Mr. Graft stated that he quit working because of anxiety, i.e., "I can't work around people, my heart will start to pound, my stomic [sic] would hurt, I would fell [sic] dizzy, I would have trouble breating [sic]." (Tr. 105-106.)

B. Procedural Background

On November 23, 2003, Mr. Graft applied for disability and supplemental security income benefits, claiming disability beginning October 15, 2002, due to a learning problem and "a problem with [his] hemoglobin." (Tr. 74.) After both applications were denied at the initial review stage, Plaintiff apparently did not pursue them further. Mr. Graft again applied for SSI and DIB benefits on September 23, 2004, this time claiming he was disabled due to anxiety. (Tr. 368-369, 63, 105.) When these applications were denied (Tr. 372-375, 34-37), Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ.")

On January 6, 2006, a hearing was held before the Honorable William W. Berg at which Plaintiff was represented by counsel.

Judge Berg issued his decision on March 16, 2006, again denying DIB and SSI benefits. (Tr. 12-21.) The Social Security Appeals Council declined to review the ALJ's decision on March 21, 2007, finding no reason pursuant to its rules to do so. (Tr. 5-7.) Therefore, the March 16, 2006 opinion became the final decision of the Commissioner for purposes of review. 42 U.S.C. § 405(h); Rutherford v. Barnhart, 399 F.3d 546, 549-550 (3d Cir. 2005), *citing* Sims v. Apfel, 530 U.S. 103, 107 (2000). Plaintiff filed suit in this Court on May 16, 2007, seeking judicial review of the ALJ's decision.

## C. Jurisdiction

This Court has jurisdiction by virtue of 42 U.S.C. § 1383(c)(3) (incorporating 42 U.S.C. § 405(g)) which provides that an individual may obtain judicial review of any final decision of the Commissioner by bringing a civil action in the district court of the United States for the judicial district in which the plaintiff resides.

## III. STANDARD OF REVIEW

The scope of review by this Court is limited to determining whether the Commissioner applied the correct legal standards and whether the record, as a whole, contains substantial evidence to support the Commissioner's findings of fact. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389 (1971); Schaudeck v. Comm'r of Soc. Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999). Findings of

8

fact by the Commissioner are considered conclusive if they are supported by "substantial evidence," a standard which has been described as requiring more than a "mere scintilla" of evidence, that is, equivalent to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, id. at 401. "A single piece of evidence will not satisfy the substantiality test if the [ALJ] ignores, or fails to resolve a conflict, created by countervailing evidence." Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983).

This Court does not undertake *de novo* review of the decision and does not re-weigh the evidence presented to the Commissioner. Schoengarth v. Barnhart, 416 F. Supp.2d 260, 265 (D. Del. 2006), *citing* Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986) (the substantial evidence standard is deferential, including deference to inferences drawn from the facts if they, in turn, are supported by substantial evidence.) If the decision is supported by substantial evidence, the Court must affirm the decision, even if the record contains evidence which would support a contrary conclusion. Panetis v. Barnhart, CA No. 03-3416, 2004 U.S. App. LEXIS 8159, *3 (3d Cir. Apr. 26, 2004), *citing* Simmonds v. Heckler, 807 F.2d 54, 58 (3rd Cir. 1986), and Sykes v. Apfel, 228 F.3d 259, 262 (3rd Cir. 2000).

## IV.  LEGAL ANALYSIS

### A.  The ALJ's Determination

In determining whether a claimant is eligible for supplemental security income, the burden is on the claimant to show that he has a medically determinable physical or mental impairment (or combination of such impairments) which is so severe he is unable to pursue substantial gainful employment[3] currently existing in the national economy.[4]  The impairment must be one which is expected to result in death or to have lasted or be expected to last not less than twelve months.  42 U.S.C. § 1382c(a)(3)(C)(i); Morales v. Apfel, 225 F.3d 310, 315-316 (3d Cir. 2000).  To be granted a period of disability and receive disability insurance benefits, a claimant must also show that he contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he was last insured.  42 U.S.C. § 423(a); 20 C.F.R. § 404.131(a).  The Commissioner does not dispute that Mr. Graft satisfied the first two non-medical requirements, and the parties agree that Plaintiff's date last insured was June 30, 2004.

---

[3]  According to 20 C.F.R. § 416.972, substantial employment is defined as "work activity that involves doing significant physical or mental activities."  "Gainful work activity" is the kind of work activity usually done for pay or profit.

[4]  The claimant seeking supplemental security income benefits must also show that his income and financial resources are below a certain level.  42 U.S.C. § 1382(a).

10

To determine a claimant's rights to either SSI or DIB,[5] the ALJ conducts a formal five-step evaluation:

(1) if the claimant is working or doing substantial gainful activity, he cannot be considered disabled;

(2) if the claimant does not suffer from a severe impairment or combination of impairments that significantly limits his ability to do basic work activity, he is not disabled;

(3) if the claimant does suffer from a severe impairment which meets or equals criteria for an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") and the condition has lasted or is expected to last continually for at least twelve months, the claimant is considered disabled;

(4) if the claimant retains sufficient residual functional capacity ("RFC") to perform his past relevant work, he is not disabled; and

(5) if, taking into account his RFC, age, education, and past work experience, the claimant can perform other work that exists in the local, regional or national economy, he is not disabled.

20 C.F.R. § 416.920(a)(4); *see also* Morales, 225 F.3d at 316.

In steps one, two, and four, the burden is on the claimant to present evidence to support his position that he is entitled to Social Security benefits, while in the fifth step the burden shifts to the Commissioner to show that the claimant is capable of performing work which is available in the national economy.[6]

---

[5] The same test is used to determine disability for purposes of receiving either type of Social Security benefits. Burns v. Barnhart, 312 F.3d 113, 119, n.1 (3d Cir. 2002). Therefore, courts routinely consider case law developed under both SSI and DIB applications.

[6] Step three involves a conclusive presumption based on the listings, therefore, neither party bears the burden of proof at that stage. Sykes, 228 F.3d at 263, n2, *citing* Bowen v. Yuckert, 482 U.S.

11

Sykes, 228 F.3d at 263.

Following the prescribed analysis, Judge Berg first concluded that Mr. Graft had not engaged in substantial gainful activity at any time during the period October 15, 2002, through the date of his decision. (Tr. 14, 20.) Resolving step two in Plaintiff's favor, the ALJ found that his severe[7] impairments included anxiety disorder, impulse control disorder, occupational problem, dysthymic disorder,[8] borderline intellectual functioning, history of learning disorder, lumbosacral strain, and eczema. (Tr. 14.) At step three, the ALJ concluded that Plaintiff's impairments, either alone or in combination, did not meet or medically equal any of the criteria in Listing 1.04, disorders of the spine; 8.05, skin disorders; 12.04, affective disorders; 12.05, mental retardation; 12.06, anxiety-related disorders; 12.08, personality disorders; or

---

137, 146-147 n.5 (1987).

[7] *See* 20 C.F.R. §§ 404.1520(c), 404.1521(a), and 140.1521(b), stating that an impairment is severe only if it significantly limits the claimant's "physical ability to do basic work activities," i.e., "abilities and aptitudes necessary to do most jobs, including, for example, walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling," as compared to "a slight abnormality" which has such a minimal effect that it would not be expected to interfere with the claimant's ability to work, regardless of his age, education, or work experience. Yuckert, 482 U.S. at 149-151. The claimant has the burden of showing that the impairment is severe. Id. at 146, n.5.

[8] Dysthymic disorder is defined as "a mood disorder characterized by chronic mildly depressed or irritable mood often accompanied by other symptoms (such as eating and sleeping disturbances, fatigue, and poor self-esteem.)" *See* medical dictionary at the National Institute of Medicine's on-line website, MedlinePlus, www.nlm.nih.gov/medlineplus (last visited April 21, 2008), "MedlinePlus."

12

any of the other impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 15-16.)

At step four, the ALJ concluded Mr. Graft had the residual functional capacity to perform work at the medium exertional level,[9] but due to his mental impairments, he would be

limited to simple, routine, repetitive tasks, not performed in a production or quota based environment, involving only simple, work-related decisions, and in general, relatively few work place changes; limited to occasional interaction with the general public; limited to occupations which require no prolonged reading for content and comprehension; and limited to occupations which do not involve the handling, sale or preparation of food, and which are not in the medical field.

(Tr. 16.)

Judge Berg further concluded that due to his non-exertional limitations, Mr. Graft could not perform his past relevant work as a forklift operator and cardboard baler which the vocational expert ("VE") at the hearing, Eugene Hoffman, had described as light/semi-skilled and medium/unskilled, respectively.[10] (Tr. 19-20; *see also* Tr. 410-411.)

In response to the ALJ's hypothetical questions at the

---

[9] Social Security Regulations define medium work as work involving lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds, and the ability to stand and/or walk six hours in an eight-hour workday. 20 C.F.R. § §404.1567(b) and 416.967(c).

[10] The ALJ's conclusion that Plaintiff could not perform his previous medium, unskilled work as a cardboard baler is not necessarily inconsistent with his later conclusion that Mr. Graft could perform other work in that same category because Mr. Hoffman testified he was considering the two jobs together as Mr. Graft had performed them. (Tr. 412.)

13

hearing, Mr. Hoffman testified there were numerous medium level unskilled jobs which an individual of Mr. Graft's education, experience, and non-exertional limitations could perform in the local or national economy; he provided the examples of hand packager, cleaner/housekeeper, and janitor for a church or in an industrial setting.[11] (Tr. 20; *see also* Tr. 413-414.) Based on Plaintiff's status as a younger individual[12] with a high school education, a history of work which did not provide transferrable skills, the medical evidence of record, and the testimony of Plaintiff and the VE, the ALJ determined at step five that Mr. Graft was not disabled and, consequently, not entitled to benefits. (Tr. 19-20.)

## B. The ALJ's Analysis of the Medical Evidence

The factual background above discusses in detail the intelligence and academic achievement tests which Mr. Graft underwent in primary and secondary school, as well his history of social difficulties during those years and his medical treatment for the episodes of unexplained chest pains, shortness of breath,

---

[11] The VE also identified light unskilled work he believed Plaintiff could perform (i.e., light fixture riveter or assembler and rubber goods cutter (Tr. 414-415)), which the ALJ did not mention in his decision. However, this omission is irrelevant to the analysis herein because an individual who is capable of doing medium work is presumed to be capable of light and sedentary work as well. 20 C.F.R. §§ 404.1567(b) and 416.967(c)

[12] Plaintiff was 22 years old on his alleged disability onset date and 25 at the time of the hearing, making him a "younger" person according to Social Security regulations. 20 C.F.R. §§ 404.1563(c) and 416.963(c).

14

and lightheadedness he experienced in 2001 through 2002. Before addressing Plaintiff's arguments in detail, we summarize the medical evidence for the period October 2002 through December 2005, after Mr. Graft applied for Social Security benefits, and the ALJ's analysis thereof.

1. *Medical Evidence:* During the second emergency room visit for complaints of check pain in October 2002 (Tr. 183-184), Mr. Graft was directed to follow up with his primary care physician, Dr. Williams, but failed to do so on at least two occasions. (Tr. 233.) No medical records are provided for the period October 22, 2002, through May 12, 2004. At that point, Mr. Graft consulted with Dr. Lee J. Harmatz, again complaining of chest pain, shortness of breath, and "heart flutter." He reported to Jody E. Dlugos, a physician's assistant, that he had experienced these symptoms for the "past couple years," and although he had gone to the emergency room for treatment, he "never had anything done about it." He was concerned he had cardiac problems, but his mother and girlfriend, who accompanied him to the physician's office, expressed their opinion that the problem was anxiety "because social situations make it worse and going out into the public makes it worse." Ms. Dlugos performed an EKG which revealed "some abnormalities," and ordered an exercise stress test and blood tests. Mr. Graft declined medication for anxiety at that time. (Tr. 262-263.)

15

On June 16, 2004, the hospital at which the stress test was to be performed advised Dr. Harmatz's office that Mr. Graft had been a "no show" for two scheduled appointments. (Tr. 253.) At a follow up appointment with Ms. Dlugos on June 24, 2004, he reported he had cancelled the test because "he just cannot leave the house to get it. He states he is fine if he is outside with just a person or two but if it is a large group of people or in a small room he feels very shaky and nervous." In addition, he reported abdominal pain, chest pain, nausea, headaches, and skin irritation. Because he now expressed a willingness to try medication for his social anxiety, Ms. Dlugos prescribed Paxil CR.[13] (Tr. 260-261.)

Mr. Graft subsequently reported that having taken Paxil as directed for a month, he was feeling "a little bit better," but still had anxiety in large gatherings with a lot of people. Ms. Dlugos increased his Paxil dosage. (Tr. 259.) In August, he reported medication had helped "get him out of his house and with his family," but he still had not been able to go to a store. "When he goes out, he gets very anxious, nervous and cannot

---

[13] Contrary to Defendant's note which seems to imply that Paxil (paroxetine) is used only for the treatment of depression (Defendant's Brief, Docket No. 11, at 5, n.4), the drug is also used to treat panic disorder, social anxiety disorder, obsessive compulsive disorder, generalized anxiety disorder and post traumatic stress disorder. Paroxetine is in a class of medications called selective serotonin reuptake inhibitors which work by increasing the amount of serotonin, a natural substance in the brain that helps maintain mental balance. See drugs and supplements entry at MedlinePlus.

16

tolerate it." (Tr. 257.) Buspar[14] was added to his medications. Dr. Harmatz completed an Employability Re-Assessment Form for the Pennsylvania Department of Public Welfare indicating that Plaintiff was temporarily disabled due to anxiety disorder for the period August 19 through November 19, 2004. (Tr. 316-317.) He was scheduled to return for follow up in three months.

Less than a month later, however, Mr. Graft reported to Ms. Dlugos that he had experienced a "bad episode" when his girlfriend left him alone in the house for a while and he had an anxiety attack in which he felt he could not breathe or move. He further noted he believed the combination of Paxil and Buspar was helpful because he could leave the house and go to stores if someone was with him. For apparently the first time, Mr. Graft inquired about seeing a psychotherapist and Ms. Dlugos strongly advised him to do so. (Tr. 254-255.)

There is no evidence Mr. Graft followed up on Ms. Dlugos's recommendation, but on November 17, 2004, at the request of the Social Security Administration, he met with Dr. Tim Bridges for a clinical psychology assessment. (Tr. 267-273.) As he had reported to Ms. Dlugos, Mr. Graft told Dr. Bridges that while the combination of Paxil and Buspar was "slightly helpful," he felt he had to have someone at home with him at all times and could not go

[14] Buspar (buspirone) is used to treat anxiety disorders or in the short-term treatment of symptoms of anxiety. *See* drugs and supplements entry at MedlinePlus.

17

out in public unless he was accompanied by another person. Dr. Bridges summarized his educational history and commented about Plaintiff's "rather severe" behavioral problems. Mr. Graft stated he had not worked for more than two years and that after his original supervisor had been replaced, "his new boss gave him problems so he quit" his last job as a forklift operator.

Dr. Bridges's clinical assessment included notes that Plaintiff established brief intermittent (i.e., not sustained) eye contact, was calm and cooperative, but appeared slightly nervous. While medications had been "quite effective," he was still "unable to venture into public areas alone without severe anxiety." On most trips outside his home, he was accompanied by his mother, who brought him to the appointment with Dr. Bridges. His speech was articulate although he used verbal patterns consistent with his intellectual limitations and did not interact except to answer specific questions. His concentration during the interview was "relatively fair," and his thought processes were goal directed and organized. Dr. Bridges noted a "limited degree" of general knowledge and concluded Mr. Graft's judgment and insight "would certainly be impaired given his intellectual limitations." (Tr. 269-270.)

With regard to social responsibility, Dr. Bridges concluded, based on past reports, that Mr. Graft was "quite impulsive and can certainly become aggressive when placed under stress." He

18

therefore opined that Plaintiff's "sense of social responsibility would be limited due to poor impulse control and his limited intellectual ability." He also noted that Mr. Graft relied on his mother for assistance and "some degree of supervision." Were he to return to work, Dr. Bridge believed Plaintiff would be best suited for "factory type positions and manual labor," positions requiring simple instructions and "frequent supervision." (Tr. 270.)

Dr. Bridges diagnosed Plaintiff with anxiety disorder not otherwise specified, impulse control disorder, and occupational problem on Axis I;[15] borderline intellectual functioning on Axis II; mild psychosocial stressors, including previous occupational limitations, poor impulse control, ongoing anxiety and limited intellectual ability on Axis IV; and a GAF of 50 both currently and within the past year. (Tr. 271.) Dr. Bridges further noted Plaintiff's ability to understand, remember and carry out simple instructions was limited due to his borderline IQ; similarly, his intelligence would affect his ability to respond appropriately to supervision, co-workers and work pressures as well as his other capabilities. (Tr. 273.)

On November 17, 2004, Mr. Graft also met with Ms. Dlugos for

---

[15] Mental disorders are described using a five "axis" method. Axis I refers to the patient's clinical disorders which are the focus of psychiatric treatment; Axis II refers to personality or developmental disorders; Axis III to general medical conditions; Axis IV to psychosocial and environmental problems; and Axis V provides an assessment of the individual's level of functioning, often by assigning a GAF score. See Online DSM-IV.

19

his three-month checkup. He reported he had not begun counseling because he had "been having problems with transportation and needs to be driven places." The combination of Buspar and Paxil was "helping him somewhat" and he was now able to leave the house with his girlfriend or another family member, but could not do so alone. Ms. Dlugos agreed he should continue to be considered disabled for three months with the Pennsylvania Department of Welfare, but noted "our goal is to get him to be able to enter the work force in some capacity." (Tr. 310-311.)

During the interview with Dr. Bridges in November 2004, Plaintiff had agreed to schedule an appointment with a therapist in the psychologist's office. (Tr. 270.) However, on February 16, 2005, Plaintiff reported to Ms. Dlugos that he still had not seen a therapist because "he and his wife [sic] have not had a car, they have had to rely on his mother to drive them around." (Tr. 309.) Plaintiff was doing "fairly well" with his medication and was able to "stay at home by himself now for several hours at a time," although he still had a problem going out in public alone. Ms. Dlugos advised Mr. Graft that if he did not begin seeing a therapist before his next three-month check up, she could not continue to provide disability forms to the Welfare Department.

According to a discharge report completed by Julie Piper, M.A., a therapist in Dr. Bridges's office, Mr. Graft began individual therapy sessions on March 2, 2005. (Tr. 290.) He

advised Ms. Dlugos on April 2, 2005, that his talks with the counselor had been helpful and he would continue his appointments. He told her he had been "diagnosed with anxiety and something else which he cannot remember, but he states it is a fear of dying." (Tr. 307.)

Mr. Graft continued therapy with Ms. Piper for a total of six sessions, but as of May 12, 2005, he was not keeping his appointments or making new ones. Ms. Piper identified his initial diagnoses as anxiety disorder nos, occupational problem, impulse control disorder, and borderline intellect. On discharge, his diagnoses were the same plus panic disorder with agoraphobia, including panic about driving, working, leaving home or being home alone. His GAF initially was 50 and 54 at termination, which Ms. Piper considered to be "moderate improvement." (Tr. 290-291.)

In Ms. Dlugos's notes of August 3, 2005, she commented that Plaintiff had been "doing better," e.g., he was able to leave the house more often and had attended a family reunion at his sister's house. He stated that overall he was much happier, even though his girlfriend had left him and their children. He had recently gotten into a fight with a neighbor and was planning to move. (Tr. 303.) Dr. Harmatz completed another employability assessment form, indicating Mr. Graft would be temporarily disabled from August 2, 2005, through February 2, 2006, due to anxiety. (Tr. 313-314.)

Mr. Graft continued to treat with Dr. Harmatz for a skin

21

disorder on his upper extremities and for a lumbosacral strain. On November 30, 2005, Ms. Dlugos noted Plaintiff and his children had moved back to his parents' house. His anxiety was "about the same," i.e., he could leave the house only if someone else were with him. He admitted he had not gone to counseling because he did not have transportation. He had no new symptoms and stated that overall he was doing "fairly well." (Tr. 297.)

In a physician's report apparently completed at the request of Plaintiff's counsel on December 14, 2005, Dr. Harmatz noted that Plaintiff complained of "chest pain and anxiety when he goes into any public situation" but with treatment, he was "now able to leave his home and be in some social situations." His prognosis was described as fair. When asked if he believed Mr. Graft would have any permanent disability, Dr. Harmatz indicated the answer was "unknown at this time." However, when asked if Plaintiff could "engage in employment on a regular, sustained, competitive and productive basis," given his impairments and/or deficits, Dr. Harmatz noted, "He is unable to engage in interpersonal relationships in public situations therefore employment is not currently suitable." (Tr. 322-324.)

2. *The ALJ's Consideration of the Medical Evidence:*[16]

[16] We confine our summary of the ALJ's consideration of the medical evidence to that pertaining to Plaintiff's mental impairments for two reasons. First, Mr. Graft does not raise any arguments regarding the ALJ's treatment of the very limited evidence regarding his physical impairments, i.e., a lumbosacral strain discussed only on two occasions in August 2002 and August 2005, and the skin disorder

22

The ALJ noted in his analysis that Mr. Graft "reported significant symptoms of anxiety disorder, including panic attacks with agoraphobia, chest pains, anxiety-related eczema and feelings of uneasiness around others, which occur 2-3 times per week, and problems with anger management." (Tr. 16.) He "reported staying in the house exclusively unless accompanied by his parents." (Tr. 17.) The ALJ summarized Plaintiff's intellectual functioning, concluding that intelligence tests had shown he was at "the low average/borderline level." (Id.)

Judge Berg then turned to the hospital emergency room records evidencing Plaintiff's chest pain and lightheadedness. He noted "all tests proved negative for active cardiac disease and [Plaintiff] was discharged for all complaints to conservative home care." (Tr. 17.) There is no recognition that at least one emergency room physician had concluded in July 2002 that Mr. Graft's chest pain could have been associated with an anxiety disorder. (Tr. 207-208.)

The medical records from Ms. Dlugos and Dr. Harmatz for the period May 12 through September 27, 2004, are summarized as follows: "These notes indicate that the claimant reported feeling better with medications, although he had occasions of panic

_____

eventually diagnosed as eczema, first reported in August 2005. Second, we conclude the ALJ appropriately considered these two impairments at step five of the analysis by limiting Plaintiff to medium level work, based, presumably on his testimony that he could lift 50 pounds despite his back pain (Tr. 396-397), and by excluding jobs in the food preparation and medical fields.

23

disorder when he left home." (Tr. 17.) There is no mention of the fact that Plaintiff reported his anxiety resulted in physical responses such as shakiness, abdominal pain, chest pain, nausea, headaches, and skin irritation or that he had failed to keep two appointments for stress tests because he could not leave the house. Nor is there mention of the fact that even after he began medication, he could not go out unaccompanied, and had at least one anxiety attack when he was left alone in his house.

The ALJ accurately noted many of Dr. Bridges's findings, but failed to include his comments that Mr. Graft's judgment and insight "certainly would be impaired given his intellectual limitations;" that he could "certainly become aggressive when placed under stress" and consequently his "sense of social responsibility would be limited due to poor impulse control and his limited intellectual ability;" and that he would require frequent supervision even in factory or manual labor jobs. (Tr. 270.) The ALJ also noted that as of November 17, 2004, Mr. Graft had not begun counseling, but did not take into consideration that the same day, Plaintiff told Ms. Dlugos he had been unable to do so because he had "been having problems with transportation," nor that his transportation problems continued until at least February 16, 2005. (Tr. 309-310.)

The ALJ concluded from the summary report covering Plaintiff's six therapy sessions between March and May 2005 that Mr. Graft had

24

"made slow, but steady progress, as evidenced by the improvement in his GAF score." (Tr. 18.) He failed to note that Mr. Graft's limited intelligence may have made therapy less than effective, as reflected in his comment to Ms. Dlugos that he had been diagnosed with anxiety and something else he could not recall by name, but described as "fear of dying," whereas there is no evidence of such a phobia in the record.

Returning to the notes from Dr. Harmatz and Ms. Dlugos for the period October 2004 through December 2005, the ALJ noted that with medication Plaintiff's "condition was stable and that over all he was 'doing fairly well.'" (Tr. 18, *citing* Tr. 297.) He failed to note that in the summer of 2005, Plaintiff's girlfriend had left him and their children and he was planning to move following a fight with a neighbor (Tr. 313-314); Dr. Harmatz continued to certify to the Welfare Department that Plaintiff was disabled for six months due to anxiety (Tr. 313-314); and that as of November 2005, Plaintiff had moved back into his parents' house, still could not go out in public unless someone were with him, and did not have transportation to get to counseling.[17]

From the physician's report dated December 14, 2005, the ALJ noted Dr. Harmatz's opinion that "employment is not suitable" but that the doctor had "declined to speculate as to whether the

---

[17] The ALJ stated that Plaintiff "was again referred for therapy, which he refused because he 'didn't have a ride.'" (Tr. 18.)

25

claimant has a permanent disability." (Tr. 18.)

The ALJ concluded, "The medical reports support some but not all of claimant's allegations." Relying on his findings regarding Plaintiff's improvement in his GAF score from 50 to 54 and on Dr. Harmatz's refusal to speculate about whether Plaintiff was permanently disabled, he further concluded:

> . . .the treatment history indicates that the claimant, when motivated, is able to control his social phobia and anxiety disorder with therapy and compliance. Additionally, the record shows that the claimant was awarded custody of his two small children. If the claimant represented himself to the court as mentally and emotionally disabled, he would not have gained custody. . . . .In sum, the objective findings find mild to moderate limitations due to anxiety disorder and few other significant findings.

(Tr. 18-19.)

### C. Plaintiff's Arguments

In his brief in support of the motion for summary judgment (Docket No. 9, "Plf.'s Brief"), Mr. Graft challenges the ALJ's analysis at steps three and five of the inquiry. In particular, he argues:

1. The ALJ failed to meet the standards required by Social Security Ruling 96-7p in his determination that Plaintiff's statements regarding the intensity, duration and limiting effects of his symptoms were not entirely credible;

2. The ALJ failed to identify the contradictory evidence on which he relied in rejecting the opinions of Plaintiff's treating sources;

3. As a consequence of the first two errors, he erred by concluding at step three that Plaintiff did not have a combination of impairments which meets or medically

equals a listed impairment; and

4.  The ALJ erred by failing to include all of Plaintiff's
    specific limitations in the hypothetical questions posed
    to the vocational expert; thus, the VE's testimony that
    other jobs exist in the national and local economies
    which Plaintiff could perform despite his limitations
    cannot be considered substantial evidence to support the
    ALJ's findings at step five of the analysis.

(Plf.'s Brief at 6.)

We withhold our discussion of the first argument at this point
and begin with Plaintiff's contention that the ALJ failed to
identify the evidence on which he apparently relied in rejecting
the opinions of Plaintiff's treating physician Dr. Harmatz and the
consultant Dr. Bridges.

1.  *Evaluation of Medical Evidence:*  Social Security
regulations identify three general categories of medical sources –
treating,   non-treating,   and   non-examining.   Physicians,
psychologists and other acceptable medical sources who have
provided the claimant with medical treatment or evaluation and who
have had an "ongoing treatment relationship" with him are
considered treating sources. A non-treating source is one who has
examined the claimant but does not have an ongoing treatment
relationship with him, e.g., a one-time consultative examiner.
Finally, non-examining sources, including state agency medical
consultants, are those whose assessments are premised solely on a
review of medical records.  20 C.F.R. § 416.902.

The regulations also carefully set out the manner in which

27

opinions from the various medical sources will be evaluated. 20
C.F.R. § 416.927. In general, every medical opinion received is
considered. Unless a treating physician's opinion is given
"controlling weight," the ALJ will consider (1) the examining
relationship (more weight given to the opinion of an examining
source than to the opinion of a non-examining source); (2) the
treatment relationship (more weight given to opinions of treating
sources); (3) the length of the treatment relationship and the
frequency of examination (more weight given to the opinion of a
treating source who has treated the claimant for a long time on a
frequent basis); and (4) the nature and extent of the treatment
relationship (more weight given to the opinions of specialist than
to generalist treating sources.) 20 C.F.R. § 416.927; *see also*
Adorno v. Shalala, 40 F.3d 43, 47-48 (3d Cir. 1994) ("greater
weight should be given to the findings of a treating physician than
to a physician who has examined the claimant as a consultant" and
the least weight given to opinions of non-examining physicians.)
The opinions of a treating source are given controlling weight on
questions of the nature and severity of the claimant's
impairment(s) when the conclusions are "well-supported by medically
acceptable clinical and laboratory diagnostic techniques and [are]
not inconsistent with the other substantial evidence in [the]
record." 20 C.F.R. §§ 416.927(c)and 404.1527(d)(2).

The overwhelming problem the Court faces in considering the

28

ALJ's decision herein is the lack of explanation for much of his reasoning. Although he summarizes the evidence accurately for the most part, critical points are overlooked or omitted. No explanation is provided for the weight he assigned to the opinions of Dr. Harmatz, Plaintiff's treating physician for more than 18 months, or Dr. Bridges, the only consulting psychologist.

This omission is particularly troubling with regard to Dr. Harmatz's conclusions regarding his ability to work. As noted above, the ALJ stated with regard to the physician's report:

Dr. Harmatz opined that due to the claimant's problems with interpersonal relationships in [public] situations that "employment is not suitable" for the claimant. . . .However, Dr. Harmatz declined to speculate as to whether the claimant has a permanent disability.

(Tr. 18, *citing* Tr. 322-324.)

We recognize that certain issues – including the question of whether a claimant is able to work – are reserved to the Commissioner. *See* "Medical Source Opinions on Issues Reserved to the Commissioner," Social Security Ruling ("SSR") 96-5p.[18] However, the rules also provide that "adjudicators must always carefully consider medical source opinions about any issue, including opinions about issues that are reserved to the Commissioner. . . .

[18] "Social Security Rulings are agency rulings published 'under the authority of the Commissioner of Social Security' and 'are binding on all components of the Social Security Administration.'" Sykes, 228 F.3d at 271, *citing* 20 C.F.R. § 402.35(b)(1). "Rulings do not have the force and effect of the law or regulations but are to be relied upon as precedents in determining other cases where the facts are basically the same." Sykes, id., *quoting* Heckler v. Edwards, 465 U.S. 870, 873 n.3 (1984).

29

[O]pinions from any medical source on issues reserved to the Commissioner must never be ignored." Id.

It appears from the ALJ's summary above that he believed Dr. Harmatz needed to opine that Plaintiff was "permanently" disabled in order for him to accept the doctor's opinion that "employment was not suitable" for Mr. Graft. We are forced to speculate on this point, however, because the ALJ offered no reasoning and did not explain the weight he gave to Dr. Harmatz's statements.

Assuming we are reading between the lines correctly, we find no support for such a conclusion. First, nothing in Dr. Harmatz's statement appears to contradict other acceptable medical evidence, e.g., the ongoing notes of Plaintiff's therapist Ms. Dlugos[19] or the conclusions reached by Dr. Bridges. Second, Social Security regulations do not require that a disability be "permanent" in order for an individual to receive benefits; rather "the law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). The medical

---

[19] We recognize Ms. Dlugos, who is described as a physician's assistant, is not an "acceptable medical source" according to Social Security regulations and her opinions may not be given controlling weight. 20 C.F.R. §§ 404.1513(a) and 416.913(d). However, the regulations also provide that the opinions of a physician's assistant may be used to show the severity of a claimant's impairments and how they affect his or her ability to work. Id.

30

evidence here shows that Plaintiff's severe anxiety was documented directly for the period June 24, 2004 (*see* Ms. Dlugos's notes at Tr. 260-261) through December 14, 2005 (*see* Dr. Harmatz's report, *supra*), and may have been documented indirectly as early as mid-summer 2002 when Plaintiff's mother discussed his severe episode of chest pain with staff in Dr. Williams's office on July 12 (Tr. 233) and Mr. Graft's testimony that he stopped working in August because he began feeling as if he were having a heart attack (Tr. 395.) Whether Plaintiff's anxiety was *disabling* for any 12-month period within that range is a question for the ALJ, not this Court. Moreover, even if Dr. Harmatz had opined that Plaintiff was "permanently disabled," such a conclusion would not be entitled to any special significance because, as noted above, the ultimate disability determination is reserved for the ALJ. 20 C.F.R. § 416.927(e); SSR 96-5p.

Defendant argues that the ALJ's conclusion was correct because Dr. Harmatz believed Plaintiff's anxiety was only temporarily disabling for discontinuous periods of three months in 2004 and six months in 2005-2006, as shown by the employment assessment forms submitted to the Department of Public Welfare. (Defendant's Brief in Support of His Motion for Summary Judgment, Docket No. 11, at 15-16.) We are not persuaded by this argument. First, there are references to three such forms in the record, although only two appear. There is no copy of a form for the period November 2004

31

through February 2005, but Ms. Dlugos's note of November 17, 2004, states that "we will disable him for the next 3 months although our goal is to get him to be able to enter the work force in some capacity." (Tr. 310-311.) There is also an inference - although not direct evidence - that Dr. Harmatz or another doctor had certified that Mr. Graft was disabled prior to August 19, 2004, because the employment re-assessment form Dr. Harmatz signed on that date indicates a doctor or psychologist had "previously provided an employability assessment form indicating that [Plaintiff] had a temporary disability. " (Tr. 316-317.) Finally, the ALJ did not rely on this reasoning or even mention the employability forms in his decision, and it is well established in this Circuit that "the grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." Fargnoli v. Halter, 247 F.3d 34, 44, n.7 (3d Cir. 2001), *quoting* SEC v. Chenery Corp., 318 U.S. 80, 87 (1943).

We also find troubling the ALJ's conclusion that "the record supports a finding that these impairments cause mild restriction in activities of daily living, moderate difficulties with social functioning, moderate difficulties in maintaining concentration, persistence and pace, and no episodes of decompensation, each of an extended duration." (Tr. 15.) In reaching this conclusion, he explicitly relied on the findings of a state agency psychologist or

32

psychiatrist[20] who completed a "Psychiatric Review Technique" form and a "Residual Functional Capacity Assessment - Mental" on December 12, 2004. (Tr. 18; *see also* Tr. 274-286 and 287-289, respectively.)

In addition to the limitations noted by the ALJ above, the state agency physician also found that Plaintiff was moderately limited in his ability to understand and remember detailed instructions, but would have no difficulty with simple instructions or work-like procedures. Similarly, he was moderately limited in his ability to carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance and be punctual, work in coordination or proximity to others without being distracted by them, complete a normal workday and work week without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 287-288.)

As to social interactions, the psychologist found Mr. Graft was moderately limited in his ability to interact appropriately with the general public, accept instructions and respond

---

[20] Social Security regulations provide that inasmuch as state agency physicians provide only a review of the medical file and do not personally examine a claimant, ALJs need not necessarily adopt verbatim, but "must consider," their opinions inasmuch as those individuals are experts in their fields and are trained in applying the regulations. 20 C.F.R. §§ 404.1527(f)(2)(i)416.927(f)(2)(i).

33

appropriately to criticism from supervisors, and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. Finally, with regard to the ability to respond appropriately to changes in the work setting and travel in unfamiliar places or use public transportation, Plaintiff was again moderately limited. (Tr. 288.)

In the narrative portion of his report, the psychologist referred to the evaluation provided by Dr. Bridges on November 17, 2004. He concluded Dr. Bridges's opinions

> . . . are consistent with the residual functional capacity determined in this decision. The examining source statements in the record concerning the claimant's abilities in the areas of making occupational adjustments, making performance adjustments, making personal and social adjustments and other work related activities are fairly consistent with the other evidence in [the] file. The record submitted by Dr. Bridges . . . is given great weight and adopted in this assessment.

(Tr. 289.)

We question these assertions because we find several points on which Dr. Bridges's conclusions seem to differ significantly from the findings of the state agency physician, for example:

- Dr. Bridges's report that Mr. Graft "must have someone at home with him at all times and he does not go out in public unless accompanied by another person" is inconsistent with the finding that Plaintiff was only moderately limited in his ability to complete a normal workday and work week[21] without interruptions from psychologically based symptoms.

---

[21] The Social Security Administration considers residual functional capacity to be the claimant's ability to perform on a regular and continuing basis, i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule. *See* SSR 96-9.

- Reports of physical harm to others, rapid and unpredictable changes from passive to aggressive behavior, and an inability to control his behavior, all of which Dr. Bridges described as "rather severe behavioral problems," seem inconsistent with a "moderate" limitation in his ability to interact appropriately with coworkers or peers without exhibiting behavioral extremes.

- A reported inability to venture into public areas alone without severe anxiety and requiring his mother to accompany him is inconsistent with "mild" restrictions in activities of daily living and a "moderate" limitation in maintaining regular work attendance without interruptions from psychologically based symptoms or in being able to travel to unfamiliar places alone.

- Dr. Bridges's view that Mr. Graft is "quite impulsive," can "become aggressive when placed under stress," and has a limited sense of social responsibility "due to poor impulse control and his limited intellectual ability" is inconsistent with a finding that he is "moderately" limited in his ability to respond appropriately to criticism from supervisors, get along with coworkers, and respond appropriately to changes in the work setting.

- The conclusion that he is only "moderately" limited in his activities of daily living is inconsistent with Dr. Bridge's statement that Plaintiff "relies on his mother for assistance and some degree of supervision" and his suggestion that a payee be appointed if he were granted benefits.

- The finding that even for factory jobs or manual labor, "instructions would certainly need to be simple with frequent supervision" is inconsistent with the conclusion that he is only "moderately" limited in his ability to understand, remember and carry out detailed instructions.

Again, there is no explanation by the ALJ of how he weighed or reconciled these apparently inconsistent statements. That is, although he stated he was persuaded that Mr. Graft's limitations were not more restricting than the state physician's assessment, he failed to explain why he rejected Dr. Bridges's far more

restrictive conclusions on the same topics.

Next, we are unable to determine the basis for the ALJ's conclusion that when Mr. Graft is "motivated," he can "control his social phobia and anxiety disorder with therapy and compliance." The record is clear that despite almost two years of medication and a short period of therapy, Plaintiff still claimed he was unable to go out in public alone, nor is there any evidence that he was not compliant with his prescribed medications. There is no evidence Mr. Graft was not "motivated" for therapy, only that he did not have reliable transportation to the sessions; in fact, Dr. Bridges commented that Plaintiff "appears motivated to attend regular counseling." (Tr. 270.) There is no hint in the medical evidence that Ms. Dlugos, Dr. Harmatz, Dr. Bridges, or any of the Frick Hospital emergency room personnel believed Mr. Graft was malingering or exaggerating either the physical symptoms associated with his anxiety attacks or the effects of anxiety on his ability to interact with others in public. To the contrary, Dr. Bridges commented that Plaintiff "appeared to answer questions in an honest and forthright manner." (Id.)

Moreover, we are unable to determine the basis for two of the ALJ's factual findings. In addition to the statement in his concluding paragraph that had Mr. Graft represented himself to a court as "mentally and emotionally disabled," he would not have been awarded custody of his two small children, the ALJ also

36

stated, "The claimant lives with his parents, along with [his] two children (ages 3 years and 20 months old) of whom the claimant won custody." (Tr. 16.) He further noted that despite his multiple impairments, "the claimant was awarded custody of his two small children and reported being able to care for them with his parents' help." (Tr. 17.)

This Court has been unable to find any evidence in the record that a court "awarded" custody of the children to Mr. Graft. The only relevant evidence on this point includes a comment in Dr. Bridge's report that as of November 17, 2004, Plaintiff had been living with his fiancee for three years and had two children with her. (Tr. 267.) On August 3, 2005, Ms. Dlugos noted that "his girlfriend over the past seven years has left him and their children." (Tr. 303.) She again noted on November 30, 2005, that Mr. Graft had moved back in with his parents and was raising his two children. (Tr. 297.) At the hearing, the ALJ ascertained that Mr. Graft had his children because his girlfriend left seven months ago, and only "comes around once in a blue moon." (Tr. 402.) In short, the only evidence in the record on this subject seems to show that Mr. Graft had custody of his children by default, not because it was awarded by a court. Therefore, to the extent that the ALJ relied on the fact that because Mr. Graft had custody of his children, he could not have been considered mentally and emotionally disabled by another court, we find no basis for such an

inference in the record.

The second point which gives the Court pause is the ALJ's reference to the fact that Mr. Graft "has a history of substance addiction disorder, which is in apparent remission." (Tr. 16.) No citation to the record is provided to support this statement, and we have been unable to find any such evidence. There is one reference in the medical evidence to marijuana use in April 2002 (Tr. 214-215), and one reference to a DUI charge in September 2004. (Tr. 253, "Per Jody [Dlugos], will not write letter to get patient out of DUI class.") The ALJ apparently relied on an RFC evaluation by the state agency physician which refers to a "history of alcohol abuse." (Tr. 289; *see also* ALJ's reference to psychologist's report including substance abuse at Tr. 17-18.) The report by Dr. Bridges, which the state agency physician purportedly adopted, does not mention alcohol abuse. In fact, Dr. Bridges stated:

Keith. . .does not have any current alcohol or drug abuse concerns. However, he reports one prior arrest over one year ago for DUI, which he reports was the last time that he was intoxicated. He reports receiving one year probation, losing his license for one month, paying a $1,000 fine, and [a] requirement to go to "group" for 12 hours and then again for 18 hours.

(Tr. 268.)

It has long been established than an ALJ must explain what evidence he has rejected as well as that which supports his conclusions. *See*, e.g., <u>Cotter v. Harris</u>, 642 F.2d 700, 705 (3d Cir. 1978). "Where there is conflicting probative evidence in the

record, we recognize a particularly acute need for an explanation of the reasoning behind the ALJ's conclusions, and will vacate or remand a case where such an explanation is not provided." Fargnoli, 247 F.3d at 42. While the ALJ is not required to identify or refer to every item in the record, "he must give some indication of the evidence that he rejects and his reason(s) for discounting that evidence." Id. at 42-43 ; *see also* Landeta v. Comm'r of Soc. Sec., No. 05-3506, 2006 U.S. App. LEXIS 20905, *14 (3d Cir. Aug. 14, 2006) (same). As the Court of Appeals has pointed out, absent such an explanation, the court is "handicapped" because it is "impossible to determine whether the ALJ's finding. . .is supported by substantial evidence." Fargnoli, 247 F.3d at 40; *see also* Stewart v. Secretary of HEW, 714 F.2d 287, 290 (3d Cir. 1983) (in the absence of such an explanation, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.)

We conclude there is probative evidence in the record in the form of statements by Drs. Bridges and Harmatz which the ALJ apparently rejected without adequate explanation. Thus, we find the ALJ's analysis is "beyond meaningful review" and this matter must therefore be remanded for clarification. *See* Burnett v. Commissioner of SSA, 220 F.3d 112, 119 (3d Cir. 2000).

2. *The ALJ's Failure to Consider Plaintiff's Impairments in Combination:* We also agree with Plaintiff that the ALJ's

conclusions about the effect of his numerous mental impairments – when taken in combination – are without sufficient analysis for this Court to determine his reasoning. Although, as noted above, the ALJ specifically considered the criteria pertaining to impairments of the spine and skin, together with depressive disorders, anxiety disorders, and mental retardation, his analysis was limited only to a discussion of why each of Mr. Graft's conditions did not satisfy the relevant Listing.[22]

Social Security regulations require the ALJ to consider the combined effect of all of a claimant's impairments without regard to whether each impairment considered alone would be of sufficient severity to satisfy a listing. *See* 20 C.F.R. §§ 404.1523 and 416.923; Beasich v. Comm'r of Soc. Sec., CA No. 02-3627, 2003 U.S. App. LEXIS 11378, *35, n.15 (3d Cir. June 6, 2003) ("when assessing the severity of whatever impairments an individual may have, the adjudicator must assess the impact of the combination of those impairments on the person's ability to function, rather than assess separately the contribution of each impairment to the restriction of his or her activity as if each impairment existed alone.") The regulations also provide that if a claimant has more than one impairment, none of which meets or equals a listed impairment, the

---

[22] We also note that the ALJ did not analyze the criteria of Listing 12.08, personality disorders, nor consider Plaintiff's learning disorder or impulse control disorder pursuant to Listing 12.02. On remand, the medical evidence pertaining to these Listings should also be evaluated.

ALJ is to review the objective medical evidence to determine whether the combination of impairments is "medically equal" to any listed impairment. 20 C.F.R. § 404.1562.

We recognize that the claimant bears the burden of "present[ing] medical findings that show his or her impairment matches a listing or is equal in severity to a listed impairment." Burnett, 220 F.3d at 120 n.2. However, courts in this Circuit have held that "[w]here the record as it exists at the time of the administrative hearing fairly raises the question of whether a claimant's impairment is equivalent to a listing, a medical expert should evaluate it." Maniaci v. Apfel, 27 F. Supp.2d 554, 557 (E.D. Pa. 1998); see also Schwartz v. Halter, 134 F. Supp. 2d 640, 659 (E.D. Pa. 2001), and Lee v. Astrue, CA No. 06-5167, 2007 U.S. Dist. LEXIS 27207, *12-*13 (E.D. Pa. April 12, 2007).

Here, Dr. Bridges commented several times in his report that Plaintiff's limited intellectual abilities would negatively impact other capabilities. For instance, he noted Mr. Graft's "rather severe intellectual impairment" would impact his ability to control his impulses, judgment and insight, sense of social responsibility, and his ability to function without frequent supervision. However, neither Dr. Bridges nor the state agency psychologist explicitly considered the combined effect of Plaintiff's numerous mental impairments on his ability to work. While Dr. Harmatz left blank the answer to a question of whether Plaintiff's condition met any

41

Listing (Tr. 324), it appears from his report that he considered Plaintiff's anxiety disorder but not his other mental limitations. Therefore, we fail to find medical evidence on which the ALJ may have relied in concluding that the combination of Mr. Graft's impairments did not "medically equal" a Listing.

While we recognize that an ALJ's decision whether to call an expert to testify on the subject of medical equivalency is a matter of discretion (*see* 20 C.F.R. § 416.927(f)(2)(iii)), we believe such an opinion would be helpful, given the apparent complexity of Plaintiff's mental impairments. *See* Watson v. Massanari, CA No. 00-3621, 2001 U.S. Dist. LEXIS 15863, *44 (E.D. Pa. Sept. 6, 2001) (concluding that because the equivalency finding is a medical determination, the ALJ should have elicited an expert opinion.) Alternatively, the ALJ could have sought clarification from Dr. Bridges or Dr. Harmatz as to their views on this specific question. 20 C.F.R. §§ 404.1512(e) and 416.912(e)(1). On remand, we suggest the ALJ consider these options in making his determination at step three of the analysis.

3. *Hypothetical Questions to the Vocational Expert:* Plaintiff argues in his next objection to the ALJ's conclusions that the hypothetical questions posed to the Vocational Expert were inadequate because they failed to reflect all the specific limitations established by the medical evidence. (Plf.'s Brief at 13-14.) We agree that several critical limitations seem to have

42

been omitted from consideration. At the hearing, the ALJ asked the VE to opine about the availability of jobs for a person who was

[l]imited to a medium range of work as that term is defined under the regulations; limited to simple, routine, repetitive tasks; not performed in a production or quota-based environment; involving only simple work-related decisions; and in general, relatively few workplace changes. The next limitation is to occasional interaction with supervisors and coworkers, but must avoid all interaction with the general public. Further limitation to occupations which require no prolonged reading for content and comprehension. And final limitation is to occupations which do not involve the handling, sale, or preparation of food, and which are not in the medical field.

(Tr. 411-412; *see also* follow-up question regarding work at the light exertional level, all other conditions the same, at Tr. 414.)

The most significant omissions from this question are Dr. Bridges's findings that Plaintiff would be limited to work which would allow "frequent supervision," the interplay between his "rather severe intellectual impairment" and his ability to control impulsive behaviors, and his propensity to "become aggressive when placed under stress." (Tr. 269-270.) At the hearing, Plaintiff's attorney followed up on these issues after the VE had identified several medium and light jobs which satisfied the ALJ's hypothetical questions. The first exchange with the VE was as follows:

Atty:    If the individual could not work independently, and needed frequent supervision, how would that impact on these jobs?

. . . .

VE:      Ordinarily, on simple, routine jobs, the maximum

43

training program is one month, 30 - really 21 working days which is one month. It's usually done in three weeks. Let's say, in six or eight weeks, he had to have somebody continue to show him, continue to teach him, and he was doing some wrong work which had to be done over. He could not handle competitive employment.

ALJ: Well, let me. . .get that clarified. . . . [W]hat you're getting at is, if the requirement for special supervision, either for purposes of production rate, or for purposes of instruction or for purposes of safety in the workplace, . . . basically was necessary [on] a persistent basis beyond the month that Mr. Hoffman talked about, the idea here would be that that person simply couldn't function in competitive employment. Is that correct, Mr. Hoffman?

VE: That is correct.

(Tr. 416-417.)

The attorney then asked:

Atty: If he had a poor ability to control some aggressive behavior towards supervisors or coworkers, how would that impact on the job?

VE: In other words, he would tell them off, he wouldn't listen to them, he would ignore them, or something like that?

Atty: Yes.

VE: That would not be acceptable, and ordinarily, a supervisor checks on. . .a worker after 30 days, two to four times a day, and if somebody says, get out of here, you're annoying me; beat it, I'm doing them [sic] right; or something similar to that, he could not handle the job. . . .Somebody has to check to see that it is done right, and it's either a group leader, table leader, straw boss, name it what you wish.

ALJ: Just so I'm clear, Mr. Hoffman, when you talk about the necessity for a supervisor checking on work two to four times a day, that is distinguished from a

44

> scenario in which a supervisor or lead worker has
> to be kind of looking over their shoulder
> constantly to teach them more of the job beyond
> that first month?

VE:     Yes, that is different.  The supervisor checks on
        everybody that two to four times a day.

(Tr. 417-418.)

As specifically recognized by the Social Security

Administration,

> Since mental illness is defined and characterized by
> maladaptive behavior, it is not unusual that the mentally
> impaired have difficulty accommodating to the demands of
> work and work-like settings.  Determining whether these
> individuals will be able to adapt to the demands or
> "stress" of the workplace is often extremely difficult.
> . . . The reaction to the demands of work (stress) is
> highly individualized, and mental illness is
> characterized by adverse responses to seemingly trivial
> circumstances.  The mentally impaired may cease to
> function effectively when facing such demands as getting
> to work regularly, having their performance supervised,
> and remaining in the workplace for a full day. . . . [A]n
> individual who cannot tolerate being supervised may be
> not able to work even in the absence of close
> supervision; the knowledge that one's work is being
> judged and evaluated, even when the supervision is remote
> or indirect, can be [intolerable] for some mentally
> impaired persons.  Any impairment-related limitations
> created by an individual's response to demands of work,
> however, must be reflected in the RFC assessment.

SSR 85-15: "Titles II and XVI: Capability to do Other Work — The
Medical-Vocational Rules as a Framework for Evaluating Solely
Nonexertional Impairments;" *see also* <u>Allen v. Barnhart</u>, 417 F.3d
396, 403-407 (3d Cir. 2005), discussing this ruling.

Limitations stemming from Plaintiff's need for more intense

supervision than usual and his inability to control his impulsive

aggressive behavior toward others with whom he was forced to

interact are both supported by Dr. Bridges' comments and by school-related records dating back to at least 1996. These are matters which would certainly affect Mr. Graft's ability to adapt to the demands of the workplace on a regular basis, yet the hypothetical questions posed by the ALJ did not incorporate these individualized limitations. A proper hypothetical question is one which reflects "all of a claimant's impairments that are supported by the record." Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987). The ALJ did not explain why he rejected Dr. Bridges's comments nor why he did not accept the VE's answers to questions by Plaintiff's attorney which incorporated them. (See Tr. 20.) Thus, the Court is left once again with no means by which to determine if these comments and the VE's testimony were rejected or simply ignored.

4. *The ALJ's Erroneous Credibility Analysis:* Plaintiff argues that the ALJ erroneously discounted his subjective complaints although there is no evidence of inconsistencies, embellishments, or malingering on his part. Moreover, the ALJ purportedly used conjecture, irrelevant or improperly paraphrased evidence, and speculative inferences as the basis for concluding Plaintiff was able to work, while at the same time failing to cite relevant evidence that supports the opposite conclusion. (Plf.'s Brief at 7-9.) Finally, because Judge Berg's adverse credibility determination would preclude Mr. Graft from "rehabilitating" his credibility, Plaintiff seeks an order directing that on remand, the

46

case be heard before a different ALJ. (Id. at 15.)

Credibility determinations are uniquely the province of the adjudicator and this Court will generally not disturb such decisions. Reefer v. Barnhart, 326 F.3d 376, 380 (3d Cir. 2003). Social Security regulations clearly describe how the ALJ is to weigh a claimant's subjective complaints (e.g., pain, fatigue, shortness of breath, weakness, or nervousness) and assess the claimant's credibility with regard to those complaints. See SSR 96-7p, "Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements." The ALJ must first ascertain if there is an underlying medically determinable physical or mental impairment which could reasonably be expected to produce the subjective symptoms. Once such a medically determined condition is identified, the ALJ must evaluate the intensity, persistence, and effects of the claimed symptoms to determine the extent to which they limit the individual's ability to do basic work activities. In this second step, the ALJ must consider the entire record, including medical signs and laboratory findings, the claimant's statements, and information provided by medical sources or other persons regarding the symptoms and how they affect the individual. See SSR 96-7p. The regulations further note that an individual's symptoms "can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone." 20 C.F.R. §§ 404.1529(c) and 416.929(c). In such

instances, the ALJ must also consider the claimant's daily
activities; the location, duration, frequency and intensity of pain
or other symptoms; factors that precipitate and aggravate the
symptoms; the type, dosage, effectiveness and side effects of
medication(s) the individual takes to alleviate the symptoms;
treatment other than medication received to relieve pain, and any
other factors concerning the individual's functional limitations
and restrictions due to the symptoms.  Id.

The ALJ stated in his decision that he had "considered all
symptoms in accordance with the requirements of 20 CFR 404.1529 and
416.929 and SSRs 96-4p ["Symptoms, Medically Determinable Physical
and Mental Impairments, and Exertional and Nonexertional
Limitations"] and 96-7p."  (Tr. 16.)  However, as we have discussed
above, the ALJ failed to explain why he concluded Plaintiff could
work on a regular, day-after-day basis, given the uncontradicted
evidence that he could not independently leave his home.  We also
agree with Plaintiff that some of the ALJ's reasoning, particularly
his conclusion that "when motivated, [he] is able to control his
social phobia and anxiety disorder with therapy and compliance," is
not based on evidence in the record.  On remand, we believe the ALJ
will resolve these problems and reconcile his credibility analysis
with his more comprehensive analysis of the medical record.

However, without evidence that the ALJ was biased against the
claimant or otherwise improperly conducted the previous hearing,

48

courts are generally reluctant to impose procedures on administrative agencies. <u>Maniaci</u>, 27 F. Supp. at 559. Plaintiff states he would find it difficult to "rehabilitate" his testimony before the same ALJ, but fails to identify any instances of prejudice against him in Judge Berg's decision. We conclude, therefore, that remand to a different ALJ is unnecessary, and leave to the Appeals Council the choice of ALJ who will consider this case on remand.

## V. **FURTHER PROCEEDINGS**

Under 42 U.S.C. § 405(g), a district court may, at its discretion, affirm, modify or reverse the Secretary's final decision with or without remand for additional hearings. However, the reviewing court may award benefits "only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the plaintiff is disabled and entitled to benefits." <u>Krizon v. Barnhart</u>, 197 F. Supp.2d 279, 291 (W.D. Pa. 2002), *quoting* <u>Podedworney v. Harris</u>, 745 F.2d 210, 222 (3d Cir. 1984).

We agree with Plaintiff that the ALJ failed to explain why he adopted the opinion of the state agency physician with regard to the extent of Plaintiff's limitations without explaining why he rejected the opinions of Drs. Harmatz and Bridges. Consequently, we conclude his analysis may have been incorrect, either in his determination that Plaintiff's combination of impairments did not

meet or medically equal a listed impairment or his subsequent credibility determination. Furthermore, we find that because the ALJ rejected or ignored, again without explanation, answers to hypothetical questions which incorporated limitations which are supported by the record, the analysis at step five may be been erroneous. However, we do not find sufficient evidence to grant benefits, particularly in the absence of expert opinion on the question of medical equivalency. Therefore, we remand for further consideration consistent with the matters raised herein.

An appropriate Order follows.

April  $29$ , 2008        *William L. Standish*

William L. Standish
United States District Judge

cc:  Counsel of Record